


# QUESTIONS AND ANSWERS ON PROVIDING SERVICES TO CHILDREN WITH DISABILITIES DURING THE CORONAVIRUS DISEASE 2019 OUTBREAK

**MARCH 2020**

The Centers for Disease Control and Prevention (CDC) is responding to an outbreak of respiratory disease caused by a new coronavirus named coronavirus disease 2019 (COVID-19). The CDC has issued interim guidance to help administrators of public and private childcare programs and K–12 schools plan for and prevent the spread of COVID-19 among students and staff. *See* Interim Guidance for Administrators of US Childcare Programs and K–12 Schools to Plan, Prepare, and Respond to Coronavirus Disease 2019 available at: https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/guidance-for-schools.html

This Questions and Answers document outlines states' responsibilities to infants, toddlers, and children with disabilities and their families, and to the staff serving these children. During an outbreak of COVID-19, local educational agencies (LEAs) and early intervention service (EIS) programs will need to collaborate with their state educational agency (SEA), Bureau of Indian Education (BIE), or local public health department, as appropriate, to address questions about how, what, and when services should be provided to children with disabilities.[1] It does not create or confer any rights for or on any person. This Q & A document does not impose any additional requirements beyond those included in applicable law and regulations. The responses presented in this document generally constitute informal guidance representing the interpretation of the Department of the applicable statutory or regulatory requirements in the context of the specific facts presented here and are not legally binding. The Q & As in this document are not intended to be a replacement for careful study of the Individuals with Disabilities Education Act (IDEA), Section 504 of the Rehabilitation Act of 1973 (Section 504), Title II of the Americans with Disabilities Act of 1990 (Title II), and their implementing regulations. The *IDEA*, its implementing regulations, and other important documents related to the *IDEA* can be found at http://sites.ed.gov/idea. For more information on the requirements of Section 504 and Title II, and their implementing regulations, please consult https://www2.ed.gov/policy/rights/guid/ocr/disabilityoverview.html.

---

[1] This document does not address when to dismiss a child or close a school or Part C state lead agency because school officials should work with their local health departments to make those decisions. School personnel and Part C EIS programs and providers, however, may consult the Centers for Disease Control and Prevention's (CDC's) guidance for recommendations regarding social distancing and school closure. The CDC's Web site contains information addressing both state and local public health officials and school administrators for school (K-12) responses to COVID-19 and resources for child care and early childhood programs. These documents, along with other recommendations, may be accessed at https://www.cdc.gov/coronavirus/2019-ncov/community/index.html.

**EXHIBIT 4**

## A. Implementing Part B of the *IDEA* and Section 504 during a COVID-19 outbreak

**Question A-1:** Is an LEA required to continue to provide a free appropriate public education (FAPE) to students with disabilities during a school closure caused by a COVID-19 outbreak?

**Answer**: The IDEA, Section 504, and Title II of the ADA do not specifically address a situation in which elementary and secondary schools are closed for an extended period of time (generally more than 10 consecutive days) because of exceptional circumstances, such as an outbreak of a particular disease.

If an LEA closes its schools to slow or stop the spread of COVID-19, and does not provide any educational services to the general student population, then an LEA would not be required to provide services to students with disabilities during that same period of time. Once school resumes, the LEA must make every effort to provide special education and related services to the child in accordance with the child's individualized education program (IEP) or, for students entitled to FAPE under Section 504, consistent with a plan developed to meet the requirements of Section 504. The Department understands there may be exceptional circumstances that could affect how a particular service is provided. In addition, an IEP Team and, as appropriate to an individual student with a disability, the personnel responsible for ensuring FAPE to a student for the purposes of Section 504, would be required to make an individualized determination as to whether compensatory services are needed under applicable standards and requirements.

If an LEA continues to provide educational opportunities to the general student population during a school closure, the school must ensure that students with disabilities also have equal access to the same opportunities, including the provision of FAPE. (34 CFR §§ 104.4, 104.33 (Section 504) and 28 CFR § 35.130 (Title II of the ADA)). SEAs, LEAs, and schools must ensure that, to the greatest extent possible, each student with a disability can be provided the special education and related services identified in the student's IEP developed under IDEA, or a plan developed under Section 504. (34 CFR §§ 300.101 and 300.201 (IDEA), and 34 CFR § 104.33 (Section 504)).

**Question A-2:** Must an LEA provide special education and related services to a child with a disability who is absent for an extended period of time because the child is infected with COVID-19, while the schools remain open?

**Answer**: Yes. It has long been the Department's position that when a child with a disability is classified as needing homebound instruction because of a medical problem, as ordered by a physician, and is home for an extended period of time (generally more than 10 consecutive school days), an individualized education program (IEP) meeting is necessary to change the child's placement and the contents of the child's IEP, if warranted. Further, if the IEP goals will remain the same and only the time in special education will change, then the IEP Team may add an amendment to the IEP stating specifically the amount of time to be spent in special education. If a child with a disability is absent for an extended period of time because of a COVID-19 infection and the school remains open, then the IEP Team must determine whether the child is available for instruction and could benefit from homebound services such as online or virtual instruction, instructional telephone calls, and other curriculum-based instructional activities, to the extent available. In so doing, school personnel should follow appropriate health guidelines to assess and address the risk of transmission in the provision of such services. The Department understands there may be exceptional circumstances that could affect how a particular service is provided.

If a child does not receive services after an extended period of time, a school must make an individualized determination whether and to what extent compensatory services may be needed, consistent with applicable requirements, including to make up for any skills that may have been lost.

---

**Question A-3:** What services must an LEA provide if a public school for children with disabilities is selectively closed due to the possibility of severe complications from a COVID-19 outbreak?

**Answer:** If a public school for children with disabilities is closed solely because the children are at high risk of severe illness and death, the LEA must determine whether each dismissed child could benefit from online or virtual instruction, instructional telephone calls, and other curriculum-based instructional activities, to the extent available. In so doing,

school personnel should follow appropriate health guidelines to assess and address the risk of transmission in the provision of such services. The Department understands there may be exceptional circumstances that could affect how a particular service is provided.

If a child does not receive services during a closure, a child's IEP team (or appropriate personnel under Section 504) must make an individualized determination whether and to what extent compensatory services may be needed, consistent with applicable requirements, including to make up for any skills that may have been lost.

---

**Question A-4:** If a child with a disability at high risk of severe medical complications is excluded from school during an outbreak of COVID-19 and the child's school remains open, is the exclusion considered a change in educational placement subject to the protections of 34 CFR §§ 300.115 and 300.116 and 34 CFR §§ 104.35 and 104.36.

**Answer:** If the exclusion is a temporary emergency measure (generally 10 consecutive school days or less), the provision of services such as online or virtual instruction, instructional telephone calls, and other curriculum-based instructional activities, to the extent available, is not considered a change in placement. During this time period, a child's parent or other IEP team member may request an IEP meeting to discuss the potential need for services if the exclusion is likely to be of long duration (generally more than 10 consecutive school days). For long-term exclusions, an LEA must consider placement decisions under the *IDEA*'s procedural protections of 34 CFR §§ 300.115 – 300.116, regarding the continuum of alternative placements and the determination of placements.

Under 34 CFR § 300.116, a change in placement decision must be made by a group of persons, including the parents and other persons knowledgeable about the child and the placement options. If the placement group determines that the child meets established high-risk criteria and, due to safety and health concerns, the child's needs could be met through homebound instruction, then under 34 CFR §300.503(a)(1), the public agency must issue a prior written notice proposing the change in placement. A parent who disagrees with this

prior written notice retains all of the due process rights included in 34 CFR §§ 300.500-300.520.

For children with disabilities protected by Section 504 who are dismissed from school during an outbreak of COVID-19 because they are at high risk for health complications, compliance with the procedures described above and completion of any necessary evaluations of the child satisfy the evaluation, placement and procedural requirements of 34 CFR §§ 104.35 and 104.36. The decision to dismiss a child based on his or her high risk for medical complications must be based on the individual needs of the child and not on perceptions of the child's needs based merely on stereotypes or generalizations regarding his or her disability.

---

**Question A-5:** May an IEP Team consider a distance learning plan in a child's IEP as a contingency plan in the event of a COVID-19 outbreak that requires the school's closure?

**Answer:** Yes. IEP teams may, but are not required to, include distance learning plans in a child's IEP that could be triggered and implemented during a selective closure due to a COVID-19 outbreak. Such contingent provisions may include the provision of special education and related services at an alternate location or the provision of online or virtual instruction, instructional telephone calls, and other curriculum-based instructional activities, and may identify which special education and related services, if any, could be provided at the child's home.

Creating a contingency plan before a COVID-19 outbreak occurs gives the child's service providers and the child's parents an opportunity to reach agreement as to what circumstances would trigger the use of the child's distance learning plan and the services that would be provided during the dismissal.

---

**Question A-6:** What activities other than special education and related services may and may not be provided with *IDEA* Part B funds both prior to and during a COVID-19 outbreak?

**Answer:** *IDEA* Part B funds may be used for activities that directly relate to providing, and ensuring the continuity of, special education and related services to children with disabilities. For example, an LEA may use

*IDEA* Part B funds to disseminate health and COVID-19 information that is specifically related to children with disabilities, to develop emergency plans for children with disabilities, or to provide other information (e.g., guidance on coordination of the provision of services in alternate locations as described in Question A-5) to parties who may need such information, including school staff responsible for implementing IEPs, parents of eligible children, and staff in alternate locations where special education and related services may be provided. LEAs, however, may not use *IDEA* Part B funds to develop or distribute general COVID-19 guidance or to carry out activities that are not specific to children with disabilities (e.g., general COVID-19 activities for all children and staff). Additionally, LEAs may not use *IDEA* Part B funds to administer future COVID-19 vaccinations to any children, including children with disabilities.

## B. *IDEA* Part C and COVID-19

**Question B-1:** Must a state lead agency continue to provide early intervention services to infants and toddlers with disabilities during a COVID-19 outbreak if the offices are closed?

**Answer:** If the offices of the state lead agency or the EIS program or provider are closed, then Part C services would not need to be provided to infants and toddlers with disabilities and their families during that period of time. If the lead agency's offices are open but the offices of the EIS program or provider in a specific geographical area are closed due to public health and safety concerns as a result of a COVID-19 outbreak in that area, the EIS program or provider would not be required to provide services during the closure. If the offices remain open, but Part C services cannot be provided in a particular location (such as in the child's home), by a particular EIS provider, or to a particular child who is infected with COVID-19, then the lead agency must ensure the continuity of services by, for example, providing services in an alternate location, by using a different EIS provider, or through alternate means, such as consultative services to the parent.

Additionally, once the offices re-open, the service coordinator and EIS providers for each child must determine if the child's service needs have changed and determine whether the individualized family service plan (IFSP) team needs to meet to review the child's IFSP to determine whether any changes are needed. If offices are closed for an extended period and services are not provided for an extended period, the IFSP team must meet under 34 CFR § 303.342(b)(1) to determine if changes are needed to the IFSP and to determine whether compensatory services are needed to address the infant or toddler's developmental delay.

---

**Question B-2:** What should a state lead agency or EIS program provider do to provide Part C services if its offices are open, but it cannot provide services in accordance with an infant's or toddler's IFSP during a COVID-19 outbreak?

**Answer:** If the offices remain open, but Part C services cannot be provided in a particular location (such as in the child's home), by a particular EIS provider, or to a particular child who is infected with COVID-19, then

the lead agency must ensure the continuity of services, on a case-by-case basis and consistent with protecting the health and safety of the student and those providing services to the student. As an example, the lead agency may consider providing services in an alternate location, by using a different EIS provider, or through alternate means, such as consultative service to the parent. Once services are fully resumed, the service coordinator and EIS providers for each child must assess the child to determine if the child's service needs have changed and to determine whether the IFSP Team needs to meet to review the child's IFSP to identify whether changes to the IFSP are needed. If the offices are closed and services are not provided for an extended period, the IFSP Team must meet under 34 CFR § 303.342(b)(1) to determine if changes are needed to the IFSP and to determine whether compensatory services are needed.

If an EIS provider cannot provide Part C services in the child's home during a COVID-19 outbreak, but the EIS program or provider determines that it is safe to provide face-to-face Part C services in another environment such as a hospital or medical clinic, then the child could receive temporary services at the hospital or clinic. Additionally, if the lead agency or EIS provider determines that face-to-face Part C services should not be provided for a period of time, then the EIS provider or service coordinator may consult with the parent through a teleconference or other alternative method (such as e-mail or video conference), consistent with privacy interests, to provide consultative services, guidance, and advice as needed. However, determining how to provide Part C services in a manner that is consistent with the most updated public health and safety guidance is left to the discretion of the lead agency and the EIS program and provider serving a particular child and family.

---

**Question B-3:** What activities other than service provision may and may not be provided with *IDEA* Part C funds both prior to and during a potential COVID-19 outbreak?

**Answer:** *IDEA* Part C funds may be used for activities that directly relate to providing, and ensuring the continuity of, Part C services to eligible children and their families. The state may use *IDEA* Part C funds to disseminate health and COVID-19 information to relevant parties, develop emergency plans to support the provision and continuity of

Part C services, or provide other information (e.g., how the lead agency staff or EIS programs or providers may provide alternate services or services in alternate locations as described in Question B-2) to relevant parties who need this information. Relevant parties may include parents of eligible children, childcare centers, staff in other locations where early intervention services are provided, EIS programs and providers, and primary referral sources. Other activities that relate to service provision, including the provision of service coordination, evaluations, and assessments, may also be funded. The state may not, however, use *IDEA* Part C funds to administer future COVID-19 vaccinations as it is a medical service under 34 CFR §303.13(c)(3).



**EXHIBIT 4**